# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | David H. Coar | Sitting Judge If Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 01 C 2682 | **DATE** | 8/11/2003 |
| **CASE TITLE** | Central States, Southeast and Southwest Areas Pension Fund, et. al. vs. The Kroger Co. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

> Cross Motions for Summary Judgment [54-1, 55-1]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ Local Rule 41.1 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] For the reasons set forth in the attached Memorandum Opinion and Order, Central States is entitled to $88,627.50 that Kroger admits is owed to Central States on employees that Kroger now concedes were not casual employees. Central States motion for summary judgment is GRANTED against Kroger for Little Rock and Houston [54-1]. Kroger's motion for summary judgment is GRANTED against Central States for Memphis [55-1]. Significant factual issues remain regarding Kroger's obligation for Louisville, the Michigan Dairy and Dallas, and those claims will be set for trial. Central States and Kroger's cross motions for summary judgment for Louisville, the Michigan Dairy, and Dallas are DENIED [54-1, 55-1].

(11) ■ [For further detail see order attached to the original minute order.]

| | | | |
|---|---|---|---|
| | No notices required, advised in open court. | | **Document Number** |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | | |
| | Notified counsel by telephone. | AUG 1 2 2003 | |
| X | Docketing to mail notices. | date docketed | 90 |
| | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| klb (lc) | courtroom deputy's initials | date mailed notice | |

CLERK
U.S. DISTRICT COURT

03 AUG 11 PM 5: 41

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS PENSION FUND, )
and HOWARD McDOUGALL, trustee, )
  )
  )
and )
  )
CENTRAL STATES, SOUTHEAST AND )
SOUTHWEST AREAS HEALTH AND )
WELFARE FUND, and HOWARD )
McDOUGALL, trustee )
  )
Plaintiffs, )
  )
v. )
  )
THE KROGER CO., an Ohio Corporation, )
  )
Defendant. )

**DOCKETED**

AUG 1 2 2003

No.  01 C 2682

HONORABLE DAVID H. COAR

## MEMORANDUM OPINION AND ORDER

This is an action brought under § 515 of ERISA, 29 U.S.C. § 1145, to collect

contributions allegedly owed by the Kroger Co. ("Kroger") to the Central States, Southeast and

Southwest Areas Pension Fund and the Central States, Southeast and Southwest Areas Health

and Welfare Fund (collectively referred to as "Central States" or individually referred to as the

"Pension Fund" or the "Health and Welfare fund").  Before this Court are cross motions for

summary judgment.  For the reasons set forth below, the Court finds that Central States is

entitled to delinquent contributions from Kroger for Little Rock and Houston.  Central States is

not entitled to delinquent contributions from Kroger for Memphis.  The issue of whether Kroger

-1-



is liable for delinquent contributions for Louisville, the Michigan Dairy, and Dallas will be set for trial.

I.     Factual Background

The Central States, Southeast and Southwest Areas Pension Fund ("Pension Fund") is an employee benefit plan and trust, with its administrative office and its principal and exclusive offices located in Rosemont, Illinois. The Central States, Southeast and Southwest Areas, Health and Welfare Fund ("Health and Welfare Fund") is an employee benefit plan and trust, with its administrative office and its principal and exclusive offices located in Rosemont, Illinois.

The Pension Fund is operated in accordance with a trust agreement. Since at least December 1970, Kroger has been bound by the Pension Fund Trust Agreement. The Health and Welfare Fund is also operated in accordance with a trust agreement. Since at least December 1970, Kroger has been bound by the Health and Welfare Fund Trust Agreement. The Pension Fund and the Health and Welfare Fund were established pursuant to Trust Agreements originally entered into by the International Brotherhood of Teamsters (and its affiliated local unions) and various employer associations. The Pension Fund and the Health and Welfare Fund are each managed by a Board of Trustees consisting of an equal number of union and employer representatives. Plaintiff, Howard McDougall, is a Trustee and a "fiduciary" of both the Pension Fund and the Health and Welfare Fund as that term is defined in Section 3(1) of ERISA, 29 U.S.C. § 1002(2).

The Pension Fund and the Health and Welfare Fund receive contributions from numerous employers pursuant to the requisite terms and conditions of collective bargaining agreements between the employers and various local unions affiliated with the International Brotherhood of

-2-

teamsters ("Local Unions"). All contributions and income earned thereon are used for the exclusive purpose of providing benefits to participants (and eligible beneficiaries) pursuant to the provisions of the Pension Fund's Pension Plan and the Health and Welfare Fund's Health and Welfare Plan, and for paying necessary administrative expenses of the Funds. The Pension Fund is a defined benefit pension plan that provides specific benefits upon retirement to participants pursuant to the terms and conditions contained the Pension Plan document. The Health and Welfare Fund is a health and welfare plan that provides specific benefits, including medical, hospital, dental and loss of time benefits, to or on behalf of Fund participants and their eligible dependants pursuant to the terms and conditions contained in the Health and Welfare Plan document.

The Pension Fund currently has approximately 3,000 participating employers. The Health and Welfare Fund currently has approximately 1,000 participating employers. Central States relies upon participating employers to self-report the work history of eligible employees in order to prepare a monthly bill and determine benefit eligibility. Under this self-reporting system, participating employers initially establish a base group of employees for whom contributions are due. Thereafter, the employers are required to notify Central States on a monthly basis of any changes in the employment status of individuals covered by the CBA (e.g., layoffs, new hires, terminations, etc.). Central States relies upon the reports submitted by employers to prepare a monthly contribution bill that is prepared and sent to the employers at or near the time the report is submitted to Central States. The monthly bills sent to employers by Central States list by name, each of the employees of the employer on whose behalf contributions are being charged based upon the employer's reporting. The bills also list all payments made by

the employer. Unless the employer notifies Central States of a change in employment status of the individuals listed on the bill, Central States assumes that there has been no change in the covered workforce from month to month and continues to bill for the same employees every month. Although there have been minor changes to the text, Central States' monthly bills have contained a Certification Clause which provides:

CERTIFICATION CLAUSE
The employer hereby reaffirms his obligation to make contributions required by the Collective Bargaining Agreement; and further represents that all those employees within the bargaining unit and eligible to participate under Internal Revenue Code and regulations and the rules of the Fund are being reported and only those employees are being reported.

From at least December of 1970 to date, Local 968 of the International Brotherhood of Teamsters ("Local 968") represented the warehouse employees and truck drivers employed by Kroger at its Houston, Texas Marketing Area Distribution Center (the "Houston Center") for purposes of collective bargaining with Kroger. From at least December of 1970 to August of 1998, Local 745 of the International Brotherhood of Teamsters ("Local 745") represented the warehouse employees and truck drivers employed by Kroger at its Dallas, Texas marketing Area Distribution Center (the "Dallas Center"), for purposes of collective bargaining with Kroger. From at lest December of 1970 to date, Local 984 of the International Brotherhood of Teamsters ("Local 984") represented the warehouse employees and truck drivers employed by Kroger at its Memphis, Tennessee Marketing Area Distribution Center (the "Memphis Center"), for purposes of collective bargaining with Kroger. From at least December of 1970 to early 1998, Local 868 of the International Brotherhood of Teamsters ("Local 878") represented the warehouse employees and truck drivers employed by Kroger at its Little Rock, Arkansas Marketing Area

Distribution Center (the "Little Crock Center"), for purposes of collective bargaining with Kroger. From at least December of 1970 to date, Local 337 of the International Brotherhood of Teamsters ("Local 337") represented the warehouse employees and truck drivers employed by Kroger at its Detroit, Michigan Dairy processing facility (the "Michigan Dairy"), for purposes of collective bargaining with Kroger. From at least December of 1970 to date, Local 89 of the International Brotherhood of Teamsters ("Local 89") represented the warehouse employees and truck drivers employed by Kroger at its Louisville, Kentucky Marketing Areas Distribution Center (the "Louisville Center"), for purposes of collective bargaining with Kroger.

Kroger and Locals 988, 984, 337 and 89 have negotiated successive collective bargaining agreements containing certain terms and conditions of employment of such bargaining unit employees at the Houston, Memphis, Louisville Centers and the Michigan Dairy covering at least the period from December 27, 1970 through December 30, 2000. Kroger and Locals 745 and 878 have negotiated successive collective bargaining agreements containing certain terms and conditions of employment of such bargaining unit employees at the Dallas and Little Rock Centers covering at least the period from December 27, 1970 to 1998, at which time the Dallas Center operations were sold to a third-party (August of 1998) and the Little Rock Center was closed (early-1998). These successive collective bargaining agreements consist of two parts, a Master agreement and a Local Supplement. Each Master Agreement, negotiated periodically by Kroger and the International Brotherhood of Teamsters Kroger Negotiating Committee (made up of Local Union and International representatives appointed by the International Union), contains certain terms and conditions (e.g., pension) common to various bargaining units of warehouse employees, drivers and other employees of Kroger including those working in Kroger's Houston,

-5-

Dallas, Memphis, Little Rock and Louisville Centers and its Michigan Dairy. The Local

Supplement is negotiated by Kroger and each Local Union for those bargaining unit employees

working in their respective location only. Each Local Supplement contains certain terms and

conditions supplementing the Master Agreement. In addition, Kroger entered into collective

bargaining agreements covering employees at its distribution centers in Atlanta, GA, Charleston,

WV, Cincinnati, OH, Fort Wayne, IN, Nashville, TN, and Roanoke, VA, that consisted of the

same Master Agreement as that applicable to the locations previously mentioned as well as

individual local supplements for each of these locations. Both the Master Agreement and the

Local Supplement form a single, unitary contract and must be read together.

The Master agreement divided the covered workforce of warehouse employees and truck

drivers into three groups: casual employees, probationary employees and regular employees. A

new hire could be either a casual or a probationary employee. The Master Agreement defined a

probationary employee as a "new employee" going through a trial period:

> Section 2.2 Probationary Employees. A new employee shall work under the
> provisions of the Agreement but shall be employed only on a trial period of thirty
> (30) working days, not to exceed sixty (60) calendar days, during which period he
> may be discharged at the discretion of the Employer ... After thirty (30) working
> days or sixty (60) calendar days, whichever comes first, the employee shall be
> placed on the regular seniority list.

The Master Agreement indicated that casual employees are "short term" employees who work

"from time to time.":

> Section 2.3 Casual Employees. (Those employees hired on a short-term basis)
> may be employed from time to time in those locations where such has been the
> practice. Before employing casual employees in other locations, the Employer
> will discuss the need with the Union, and such must be agreed to by the Union.
> Casual employees shall not receive fringe benefits or accrue seniority and shall be
> limited to ten percent (10%) of the work force.

The pension clause in the Master Agreement required Kroger to contribute to the Pension Fund a specified weekly amount "on behalf of all employees who had worked for thirty days or more and who had been placed on the seniority list ..." The pension clause also stated that contributions were due on "each regular ... employee, even though such employee may work only part-time under the provisions of this agreement." However, the definition of the term "casual employee" in the Master agreement provides that casuals "shall not receive fringe benefits or accrue seniority." Thus, under the Master Agreement, Kroger is required to make contributions to Central States on behalf of all probationary employees who had completed their trial period, but not on behalf of casual employees.

The Pension Fund Trust Agreement and the Health and Welfare Trust Agreement authorize the Trustees of the Pension Fund and the Trustees of the Health and Welfare Fund to audit the records of participating employers to verify the accuracy and completeness of employee work history reported by the employers. In 2001, the Pension Fund began an audit of Kroger's records of the Houston, Dallas, Memphis, Little Rock and Louisville Centers and the Michigan Dairy covering the period of December 27, 1970 through December 30, 2000. In addition, the Health and Welfare Fund began an audit of Kroger's records of the Houston Center covering the same period. The Audit revealed employees, for whom Kroger had not contributed, that Central States believed were newly hired, regular employees who had completed the probationary period. Kroger refused to contribute on behalf of these individuals because it asserted that all of the employees were ineligible casual employees.

<u>Houston Center</u>

At the Houston Center, Kroger designated all or virtually all newly hired warehouse employees as casuals. From at least 1992 to at least January, 2001, each and every new warehouse employee at the Houston Center has been designated as casual. The Assistant Distribution Manager at the Houston Center testified that a casual employee is, *inter alia*, a person who is "working towards a full-time position." Since at least 1992, when interviewing prospective "casual" warehouse employees, each applicant was told, *inter alia*, that: (i) he had to be available seven days a week, twenty-four hours a day; (ii) he would have the opportunity to become a regular, full-time employee based on his work performance; and (iii) if he met certain criteria, he would become a regular, full-time employee and would be entitled to benefits. Since at least the mid-1990s, all Houston Center new hires, including employees designated as "casual" employees, received a standard training session. This included training on procedures, policies, what the job required and watching a film. From 1992 to the present, a Houston Center employee designated by Kroger as a "casual employee" would become eligible to become a regular, full-time employee by coming to work on time, minimizing absenteeism and tardiness, meeting productivity standards, producing quality and accurate work and having an attitude that was cohesive to the team environment. The Director of Distribution at the Houston Center also testified that the number of hours worked and the number of days worked in a week is irrelevant to whether an employee is a casual employee. The employees designated as casuals were given work schedules, but could be sent home if no work was available. At the Houston Center, some employees designated as "causal" routinely worked more than 40 hours of work per week.

## Dallas Center

A Personnel Manager at the Dallas Center testified that an employee could work as a casual employee "forever." The Personnel Manager and a Human Resources Manager at the Dallas Center testified that the term "short-term" did not place any limitation on the length of time that an employee could remain a casual employee. The Distribution Manager also testified that there was no limitation on how many consecutive days an individual could work as a casual employee or how long an individual could remain as a casual employee. He further testified that a casual employee could work everyday for a period of a year or for a period of five years under Section 2.3 of the Master Agreement. When a regular, full-time position became available at the Dallas Center, Kroger would attempt to fill that position with a qualified, casual employee. Kroger made an effort to insure that the "casual" employees at the Dallas Center did not average 32 hours of work (or more) over a 12 week period because they could then become eligible for health care benefits and it was Kroger's intent to not have them eligible.

## Memphis Center

An Associate Distribution Manager at the Memphis Center testified that a casual employee was probably someone who works less than five days a week. He also testified that a casual employee could work four days a week and 40 hours a week. A Distribution Manager at the Memphis Center testified that a casual employee is usually someone who is hired for a designated length of time. An Associate Distribution Manager at the Memphis Center testified that he understood "from time to time" to mean "all the time." A Distribution Manager at the Memphis Center testified that the phrase "from time to time" meant "sporadically." For example, someone who works two weeks at Christmas, two weeks during the summer, then in

-9-

the fall. At the Memphis Center, the number of hours and the number of weeks an individual worked did not determine whether an employee was a casual. Those individuals hired as casuals were probably told or understood that if they did good work they could eventually become regular, full-time employees. Whether a casual employee got promoted to a regular, full-time position was dependent upon whether a regular, full-time position was available. Casual employees at the Memphis Center had schedules for when they needed to work, but they might also be called in on days they were not scheduled to work. Casual employees did not have to call in everyday to find out the schedule. A Distribution Manager at the Memphis Center testified that, with the exception of a few individuals, all of the casual employees that were hired were told exactly how long they would work.

Little Rock

In 1986 and from at least 1992 to 1998, all of the warehouse new hires at the Little Rock Center were hired as casual employees. The Warehouse Manager at the Little Rock Center testified that it was advantageous to hire everyone as casual employees because they were hired at a cheaper wage rate and they did not receive any benefits. From September 12, 1982 to September 26, 1998, the Local Supplements for the Little Rock Center included the following provision:

> Effective with employees hired after September 12, 1982, ten percent (10%) of the warehouse work force shall be non-guaranteed (daily and weekly).
> The Employer agrees the use of Casual Employees is intended to replace absent employees whatever the reason (such as sickness, vacations, personal holidays, jury duty, funeral leave, etc.) and to cover peak tonnage situations which require more employees than a normal crew.
> The intent is not to replace full-time jobs in the bargaining unit....

The Little Rock Center had a seniority list for casual employees. Work was assigned to casual employees by seniority. When the Little Rock Center hired a casual employee, Kroger's hope and expectation was that the employee would be employed by Kroger for a long time. Some applicants who were hired as a casual employee were told that they could work up to 40 hours a week and overtime might be available. When hired, casual employees receive the same training as those employees hired for regular, full-time positions. From September 12, 1982 to September 26, 1998, the Local Supplements for the Little Rock Center included the following provision: "Any employee on Casual list ninety (90) days or more will be considered for full-time employment before additional employees are added to the seniority list." When a regular, full-time position opened up at the Little Rock Center, Kroger was more likely to fill that position with a casual employee as opposed to hiring a new employee.

Michigan Dairy

From late 1989 to the present, the Michigan Dairy had employees whose job classification is "vacation relief." These employees were used to fill in for other employees who were on vacation, sick or injured. A vacation relief employee is not the same as a casual employee. From late-1989 to the present, the Michigan Dairy had three employee classifications: (i) regular full-time employee; (ii) probationary full-time employee; and (iii) casual employee. When the Michigan Dairy advertised for a casual position, it did not mention that the position was short term or temporary. When the Michigan Dairy hired a casual employee, he was not told anything about how long he would be employed there and was not told that the job was short term or temporary.

At the Michigan Dairy, Kroger's determination as to whether it should hire someone as a casual versus full-time employee was dependent upon whether there was a full-time position available. From late-1989 to the present, when a casual employee was hired, he received Michigan Dairy's rules and regulations. When a casual employee was hired, he was told that if a regular, full-time position becomes available, he could be promoted to that position. When a casual employee wanted to be considered for a regular, full-time position, he was told that it would depend on what the job was, what the qualifications were, and what the employee's work record was. If a regular, full-time position opened up at the Michigan Dairy, Kroger's first choice was to fill that position with a casual employee. Kroger would hire a casual employee to fill that position if he was qualified and was reliable. If a casual employee was a good employee and stayed long enough at the Michigan Dairy, he could become a regular employee once a regular position opened up. At the Michigan Dairy, Kroger believed that it could use casual employees "whenever you want for however long you want." Kroger also believed that an employee could work as a casual indefinitely.

Louisville

The Local Supplements for the Louisville Center refer to casual employees in some provisions and refer to part-time employees in other provisions. From 1970 to 1994, the Local Supplements for the Louisville Center contained the following provision:

> Casual and part-time employees shall be given an opportunity to qualify as regular employees if available when needed and be placed at the bottom of the seniority board if they meet all qualifications of new applicants for regular employment and shall accumulate seniority from the date of regular employment.

In November 1994, the term "part-time" was deleted. In the Louisville Center, the persons hired by Kroger as regular employees were previously employed by Kroger as casual employees.

The employee handbook stated, *inter alia,* as follows:

CONGRATULATIONS!

We think you have made a good decision in joining Kroger. On behalf of our growing organization, I would like to welcome you to our team and thank you for the vote of confidence you have given us by selecting Kroger.

Your first few days with us will be most important ones - for you and us ...

* * * *

By showing an interest, working hard, asking questions, and getting along well with your fellow employees, you will soon get in the "swing of things" and begin to fully enjoy your job - a job which you will find is extremely important.

* * * *

The Louisville Center had something called the "Casual List" which listed all of the casual employees at that location. The list was used to determine who was the most senior casual and therefore, eligible for any full-time opening. A Distribution Manager in the Louisville Center testified that there were no restrictions on how long an individual could remain a casual employee in the warehouse. He also testified that there were no restrictions on how many consecutive days an employee could work as casual. A Supervisor in the Louisville Center testified that a casual employee could work five days a week.

From 1970 to 1994, the Local Supplements for the Louisville Center had the following provision:

It is agreed that Article 2, Section 2.2 of the contract is superceded by the following: Until an employee in the warehouse and garage has worked four (4) consecutive weeks of five (5) days each he shall be on a trial basis and may be discharged at the discretion of the Employer. For employees in the transportation

-13-

department an employee who works in part of six (6) consecutive weeks will be placed on the seniority list. During this period, he shall work under the wage and working conditions provision of this Agreement.

Prior to the effective date of the 1994 Louisville collective bargaining agreement, if a casual employee worked four (4) consecutive weeks of five (5) days each, that individual would become eligible to become a regular, full-time employee. For that and other reasons, Kroger would not permit casual employees to work four (4) consecutive weeks of five (5) days each.

The Local Supplements to the Louisville Center contained the following provisions:

Part-time employees will be given first preference, if qualified, for regular employment based on length of service with the Employer.

This provision was changed effective March 19, 1989 to read:

Casual and part-time employees will be given first preference, if qualified for regular employment based on length of service with the Employer.

It was later amended effective November 17, 1994 to read:

Casual employees will be given first preference, if qualified, for regular employment based on length of service with the Employer.

II.     Procedural Background (The Prior Litigation)

Kroger's use of "casual employees" in its Atlanta, Georgia Marketing Area Distribution Center (the "Atlanta Center") and its failure to remit contributions on behalf of those "casual employees" was the subject of prior litigation which was filed on June 18, 1993. Central States Pension Fund v. The Kroger Co., Case No. 93 C 3669 (N.D. Ill.) ("Kroger I"). Kroger and Local Union No. 528 entered into successive collective bargaining agreements for the Atlanta Center covering at least the period of September 19, 1976 through September 28, 1976 that included the same Master Agreements that were in effect at the Houston, Dallas, Memphis, Little Rock and

-14-

Louisville Centers and the Michigan Dairy. In 1991, The Pension Fund performed its first

payroll audit of records related to Kroger's Atlanta Center. This audit covered the period of

December 26, 1986 through December 30, 1989 and revealed that Kroger had not contributed on

newly hired, permanent Atlanta employees who had completed the 30-day probation period.

Kroger refused to contribute on behalf of these individuals because it asserted that all of the

employees were ineligible casual employees.

From 1977 until at least 1992, all or virtually all new warehouse employees employed at

Kroger's Atlanta Center, when hired, were designated by Kroger as "casual" employees.

Employees who were designated as "casual" warehouse employees at the Atlanta Center were

not placed on the "regular seniority list." Once Atlanta Center employees designated by Kroger

as "casual" warehouse employees became "regular" warehouse employees, they were assigned to

permanent, full-time bid positions, accrued seniority and became entitled to have Pension Fund

contributions made on their behalf, regardless of the number of hours they worked. Unlike the

employees who were designated by Kroger as "casual" warehouse employees, "regular"

warehouse employees appeared on the "regular seniority list." From 1977 until at least 1992,

Atlanta Center employees who Kroger designated as "casual" warehouse employees who bid on

"regular" positions were required by Kroger to serve a probationary or trial period, regardless of

their length of prior employment, after which they were then designated by Kroger as "regular"

warehouse employees entitled to fringe benefits provided under the collective bargaining

agreements, including coverage by the Pension Fund and were placed on the "regular seniority

list" at that point and not sooner.

The district court in *Kroger I* held that the term "casual employee" referred to those employees "that Kroger intended, when it hired them, to work for a short period of time. Casual employees, the court reasoned, would not be employees Kroger expected 'in the normal course' to work 'for a long period of time.'" Central States, Southeast and Southwest Areas Pension Fund v. Kroger Co., 226 F.3d 903, 912 (7th Cir. 2000). The district court also explained that "casual employees would be people 'who come and go, people whose employment is interrupted, people who might be absent for long periods of time,' rather than people 'who are on hand continuously to work part-time as needed.'" The Seventh Circuit stated that it "[agreed] with the district court's assessment of the meaning of 'casual employee.'" Kroger, 226 F.3d at 912.

The district court in *Kroger I* observed that the Atlanta Center warehouse employees "could not have been hired on a 'short-term basis' because 'the employees in question were hired by Kroger with the hope and the expectation that they would become, each of them, full-time regular employees when an opening occurred.'" Kroger's "'hope was that the training that would be given to these employees would be utilized by the employee to complete their probationary period successfully and to equip themselves to become full-time employees when the opportunity arose.'" Kroger, 226 F.3d at 909. Moreover, the district court noted that "the employees in question could not have been 'employed from time to time,' ... because that phrase referred to 'people who come and go, people whose employment is interrupted, people who might be absent for long periods of time,' and did not refer to people 'who are on hand continuously to work part-time as needed.'" Kroger, 226 F.3d at 909. In the district court's view, "the evidence showed that the employees in question were available, and were considered to be available to Kroger, 'on

a continuous basis to work part-time as needed during the peaks and valleys' of Kroger's Atlanta operation." Kroger, 226 F.3d at 909.

The district court further explained that "the content of the employee handbooks Kroger had provided to its new hires, as well as the manner in which the employees had been trained and nurtured, demonstrated that the employees in question 'were by no means regarded as people who were likely to be on hand for only a short period of time.'" Kroger, 226 F.3d at 909. As an example, the district court noted that one of the employee handbooks used by Kroger welcomed the employees to the "Kroger team" and instructed them to use the hand book "'as a training tool and guide during your first several weeks at Kroger.'" Kroger, 226 F.3d at 913.

The district court also explained, "'it was expected that in the normal course, [these employees] would work for a long period of time, both as what was referred to as part-timers, and then eventually as people who achieved regular employment and got on the regular seniority list.'" Kroger, 226 F.3d at 909. The district court further found that, "regardless of whether the employees stayed with Kroger for a long time, Kroger hired these employees with the intention that they would remain with the company and eventually become 'regular' employees. Even though Kroger had a high turnover rate at the Atlanta facility, there was also evidence that eventually a new hire that stayed with the company either had to bid for a permanent position, or failing that, was fired." Kroger, 226 F.3d at 913.

Since the Atlanta Center employees hired were not casual employees when they were hired, the district court determined in *Kroger I* that they were necessarily probationary employees for whom contributions were owed after completion of the probationary period. Because Kroger did not contribute on its new hires after they completed the probation period but instead, waited

until the new hires bid on a warehouse job and completed a trial period, the court determined in

*Kroger I* that Kroger owed additional contributions to the Pension Fund. During the course of

*Kroger I,* Kroger represented that it maintained the same practice of designating all new

warehouse employees as "casual" warehouse employees and of not making Pension Fund

contributions on their behalf while in casual status at its Dallas, Houston, Memphis, Little Rock

and Louisville Centers. The Seventh Circuit held that "[w]hatever meaning Kroger and the

Union may have ascribed to 'part-time' in the Local Supplement, Kroger's practice of treating

the employees in question as 'casuals' for pension contribution purposes when, in fact, those

employees were not hired on a short-term basis or employed from time to time cannot thwart the

unambiguous definition of casual employees contained in the CBA." <u>Kroger</u>, 226 F.3d at 914.

III.    Discussion

The statutory basis for Central State's claim against Kroger is § 515 of ERISA, which

provides:

> Every employer who is obligated to make contributions to a
> multiemployer plan under the terms of the plan or under the terms
> of a collectively bargained agreement shall, to the extent not
> inconsistent with the law, make such contributions in accordance
> with the terms and conditions of such plan or such agreement.

29 U.S.C. § 1145. This section entitles pension funds to enforce the terms of agreements when

those terms are unambiguous. <u>See</u> <u>Central States, Southeast & Southwest Areas Pension Fund v.</u>

<u>Hartlage Truck Serv., Inc.</u>, 991 F.2d 1357, 1361 (7th Cir. 1993). Central States is seeking

contributions from December 27, 1970 through December 30, 2000. There is a 1993 tolling

agreement between the parties. Applying the 10 year statute of limitations for written contracts in Illinois, all claims arising before June 18, 1983 are time-barred.[1]

The audit revealed that in several instances, Kroger failed to contribute on behalf of employees it concedes were probationary employees when they were hired after completion of the probation period. Kroger does not dispute its liability with respect to these individuals. Thus, summary judgment is entered against Kroger with respect to $88,627.50 in contributions owed on these employees.

With respect to contributions owed by Kroger for "casual" employees, the Court will consider whether the evidence shows that the Kroger employees in question were treated as "casual" by the company and the union as that term is used in the collective bargaining agreement. The Seventh Circuit made clear that under the collective bargaining agreement the term "casual" employees refer to "those employees that Kroger intended, when it hired them, to work for a short period of time." Each of the Kroger locations will be addressed in turn.

Little Rock

Kroger argues that the provisions in the Little Rock supplemental agreements alter the definition of "casual" employment. Since 1970, the Little Rock supplement provided: "The Employer agrees that casual employees are to be assigned available work in order of their respective length of service in that capacity. A casual employee who is being worked with regularity in such capacity will not be required to report for work until he has had a minimum of eight (8) hours off duty." Since 1982, the local supplement has provided: "Any employee on the

---

[1]Even if the Court did not apply the statute of limitations to bar claims prior to 1983, the Court would not be able to determine liability because there is a lack of evidence regarding that time period.

-19-

Casual List ninety (90) days or more will be considered for full-time employment before additional employees are added to seniority list." Since 1982, the local supplement has provided: "The Employer agrees the use of Casual employees is intended to replace absent employees whatever the reason (such as sickness, vacations, personal holidays, jury duty, funeral leaves, etc.) and to cover peak tonnage situations which require more employees than a normal crew ... The intent is not to replace full-time jobs in the bargaining unit." Thus, Kroger asserts that the Little Rock supplements anticipate that causal employees will work "with regularity." These provisions, however, do not contradict the language in the Master Agreement indicating that casuals are "short term" and work "from time to time." Since the provisions of the Master Agreement and local supplement must be read together and harmonized, this language necessarily refers to short "lengths of service" and short periods of being worked "with regularity." Any other interpretation is impermissible because it would render this language inconsistent with the Master Agreement definition of a casual employee as employees ""hired on a short term basis" who were working from time to time."

Kroger next argues that there is no evidence that Little Rock's use of casuals was inconsistent with the definition of casual as set forth in *Kroger I*. Kroger asserts that the practices in Little Rock were nothing like those in Atlanta. In particular, Little Rock casuals did not receive employee handbooks or written job rules. They were not given any training other than on-the-job training. Further, when a regular position became available, it could be offered to a casual who was a good performer and the casual was not required to accept it. Nonetheless, just as in *Kroger I*, during the period from 1992 to 1998 every newly hired employee in Little Rock was labeled as "casual." It is incredulous to assert that Kroger intended all of the

-20-

employees it hired since 1992 to work "on a short term basis" and to work "from time to time."

Indeed, Kroger hired employees as casuals because casuals were paid less than regular employees

and did not receive any benefits. At the time of hiring, it was Kroger's hope that a casual who

was a good employee would stay at Kroger "a long time." As regular positions became available,

Kroger was more likely to offer it to a "casual" employee than to hire someone new. In addition,

just as in *Kroger I*, there was a seniority list for "casual" employees. Thus, casual employment,

as used by Little Rock, was merely a stepping stone to regular employment in that it was a time

to determine if an employee was a good employee and deserving of regular employment with

higher wages and benefits. Accordingly, Central States is entitled to delinquent contributions

from Kroger for the period of 1992 to 1998.

Houston Center

The Houston Center supplements do not mention the term casual employee. Beginning in

1992 all new hires were designated as "casuals." Nonetheless, Kroger argues that these

employees fit the definition of casual employees as set forth in the Master Agreement. The

Assistant Distribution Manager at the Houston Center testified that a casual employee is, *inter*

*alia*, a person who is "working towards a full-time position." Since at least 1992, when

interviewing prospective "casual" warehouse employees, each applicant was told, *inter alia*, that

he would have the opportunity to become a regular, full-time employee based on his work

performance. Thus, just as in *Kroger I*, the employees designated as casual were not "hired on a

short term" basis as required by the Master Agreement definition of a casual employee. Further,

since at least the mid-1990s, all Houston Center new hires, including employees designated as

"casual" employees, received a standard training session. This included training on procedures,

policies, what the job required and watching a film. From 1992 to the present, a Houston Center employee designated by Kroger as a "casual employee" would become eligible to become a regular, full-time employee by coming to work on time, minimizing absenteeism and tardiness, meeting productivity standards, producing quality and accurate work and having an attitude that was cohesive to the team environment. The employees designated as casuals were given work schedules, but could be sent home if no work was available. Kroger argues that Houston may be distinguished from Atlanta in *Kroger I* because there was no training manual that identified the newly hired casuals as "probationary" employees and regular positions were not offered based upon seniority. The fact that the Houston Center did not explicitly label the new hires as probationary is irrelevant in the face of Houston's clear practice of treating employees in that manner. In Houston, as in Atlanta, "casual" employment was nothing more than a stepping stone or trial period prior to regular employment with higher wages and benefits. Accordingly, Central States is entitled to delinquent contributions from Kroger for the period 1992-2001.

Memphis

The Memphis Center local supplements do not mention casual employees. A Distribution Manager at the Memphis Center testified that a casual employee is usually someone who is hired for a designated length of time. A Distribution Manager at the Memphis Center testified that the phrase "from time to time" meant "sporadically." Whether a casual employee got promoted to a regular, full-time position was dependent upon whether a regular, full-time position was available. A Distribution Manager at the Memphis Center testified that, with the exception of a few individuals, all of the casual employees that were hired were told exactly how long they would work. Thus, the evidence shows that throughout the relevant time period, use of

casuals in Memphis was limited to employees hired for specific projects or definite periods and summer and holiday help. There is simply no evidence that there was any expectation these employees would become regular employees or work for long periods of time. Unlike *Kroger I*, not all new hires were casuals and a casual was not required to accept an offer of regular employment. No handbooks or shop rules were given to casual employees, but shop rules were given to probationary employees. The limited use of casuals at Memphis clearly satisfied the definition of "casual employee" set forth in *Kroger I*. Accordingly, Central States is not entitled to delinquent contributions from Kroger.

## Dallas Center

The Dallas Center local supplements do not mention the term "casual employee." Central States argues that the employees labeled as "casual" in Dallas were not casual as that term in set forth in the Master Agreement because the Dallas Center employees worked substantial hours week after week and there were employees who were expecting permanent employment. In addition, when Kroger believed that a full-time position was open, it was offered to one of the "casual employees." In determining the status of the disputed employees in *Kroger I*, however, the Seventh Circuit focused on Kroger's intent and expectation at the time of hiring, not that of the employee. While there is evidence that the managers in Dallas did not believe the term "short-term" put a limit on the length of time an employee could remain a casual employee, the record is bare as to whether at the time of hiring it was Kroger's intent for the "casual employees" to work for a long time. As a genuine issue of fact remains regarding Kroger's intent, the cross motions for summary judgment are denied.

## Michigan Dairy

Central States argues that because employees at the Michigan Dairy designated as "casuals" worked for lengthy periods of time and some wished to become regular full-time employees, they were not casuals as that term is defined by the Master Agreement. *Kroger I*, however, focused on Kroger's intent and expectation at the time of hiring. Central States argues that since Kroger did not advertise casual positions as temporary or hire casuals for purely temporary projects, Kroger must have intended them to become full-time employees. While this may turn out to be a reasonable inference, it is improper for the Court to make such an inference at this juncture. A genuine issue of material fact remains regarding Kroger's intent at the time that the casual employees were hired. Accordingly, the cross motions for summary judgment are denied as to the Michigan Dairy.

## Louisville

The defendants argue that the interpretation of "casual" in Atlanta under *Kroger I* does not apply in Louisville because, unlike the Atlanta local supplements, which the court in *Kroger I* found were silent as to casuals, the Louisville local supplements contain numerous express references to the terms and conditions of casual employment. Throughout the relevant period, the Local provided: "Casual and part-time employees shall be given an opportunity to qualify as regular employees if available when needed and be placed at the bottom of the seniority board if they meet all qualifications of new applicants for regular employment and shall accumulate seniority from the date of regular employment." Since 1989, the Local has provided that casual employees "will be given first preference, if qualified, for regular employment based on length of service with the Employer." The 1994 and 1999 local supplements provided that "If a regular

full time position becomes available, the most senior casual employee who requests the full time position will be given the opportunity for regular status through qualification for 20 actual working days ... If a casual employee refuses a regular job opening, the employee's length of service will be changed to the date of regular job opening refusal." Thus, according to the defendants, there can be no limitation on the length of casual employment because the decision of whether or not a casual employee is given an opportunity for regular employment is based on the casual employee's length of employment.

The defendant's argument that the Master Agreement, as interpreted in *Kroger I*, is nullified by the local supplements fails because the Master Agreement controls over the local supplements and the agreements must be harmonized. Nothing in the language indicating that casuals would be given the first opportunity to qualify for regular employment based upon seniority eliminates the requirement that casuals be short term employees. Kroger's claim that this language distinguishes *Kroger I* is unfounded. The *Kroger I* court noted that the Atlanta "casual" employees had the same right to bid on any regular openings in seniority order yet the court still determined that casuals had to be short term. Kroger, 226 F.3d at 907-08. The other two provisions relied upon by Kroger indicate that current casuals will be offered three days of work per week if available and require they be given a minimum of five hours of work if they are called in. Nothing in these provisions remotely touches upon the duration of the employment relationship, which under the Master Agreement still must be "short term" and "from time to time."

Kroger next argues that the employees labeled as "casual" were in fact "casual," as that term is defined in *Kroger I*. Kroger contends that until the early-1990s casuals who wanted to

work could appear at the daily "show-up," if there was work, casuals were selected based primarily upon their productivity. After the early 1990s, casuals were asked to provide their availability and were told when they should appear if they wanted to work. If there was no work available, the casuals would be sent home. Casuals were required to be available to work on weekends. Further, according to Kroger, many of the employees labeled as casuals worked only sporadically or only during summers or holidays. Nonetheless, Kroger manipulated work assignments to insure that the new hires would not complete the probationary period of four consecutive weeks of working five days. In addition, Kroger kept productivity records of its casuals and hired its regular employees from its pool of casual employees. It is not clear from the record whether Kroger had a policy of labeling all employees from Louisville as casual or whether it intended for the employees that were labeled as "casual" to work for a long period of time. Thus, significant factual issues remain which preclude this Court from determining whether Central States is entitled to delinquent contributions from Kroger.

<u>Kroger's Equitable Defenses</u>

Kroger first argues that Central States' claims are barred in their entirety by laches. Kroger asserts that Central States knew about Kroger's practices and failed to challenge Kroger on its practices until now. Thus, according to Kroger, Central State's unreasonable delay is fatal to its claims. Laches bars those claims where the plaintiff's unreasonable delay in bringing suit harms the defendant. <u>Hot Wax, Inc. v. Turtle Wax, Inc.</u>, 191 F.3d 813, 824 (7th Cir. 1999). A party's "unreasonable delay" is shown by proof of "lack of diligence," <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 122 S.Ct. 2061, 2077 (2002). Kroger maintains that it has been harmed because if Central States had notified Kroger of potential problems earlier, Kroger would have

immediately sought to rectify those problems. Now, Kroger's ability to defend itself has been prejudiced by the loss of evidence and witnesses over 30 years. It is an open question of law whether laches applies to ERISA actions. The Court need not address that, however, because the evidence put forth supports back contributions owed beginning in the 1990s. Thus, there has been no delay or prejudice in bringing the current ERISA action for contributions owed from the 1990s.

Kroger next claims that Central States' claims are barred by equitable estoppel. A party's claims are barred by equitable estoppel where that party has made a written, knowing misrepresentation that has been reasonably relied on by the other party to its detriment. Coker v. Trans World Airlines, Inc., 165 F.3d 579, 585 (7th Cir. 1999). Reliance is reasonable "only if the party asserting estoppel does not or should not know the truth." Bakery & Confectionary Union & Indus. Int'l Pension Fund v. Ralph's Grocery Store, 118 F.3d 1018, 1027 (4th Cir. 1997). Kroger maintains that, throughout the relevant period, Kroger regularly sent information on employees for whom contributions were due, using forms prescribed by Central States and Mark IV reports prepared by Kroger. Central States regularly sent contribution bills to Kroger; those bills listed each employee for whom contributions were due. Thus, Kroger argues that since Central States had detailed knowledge about Kroger's practices, Kroger reasonably relied upon the contribution bills as statements by Central States that those practices were acceptable. This argument was previously rejected by the Seventh Circuit in *Kroger I*. As stated in *Kroger I*, "Kroger's estoppel argument is foreclosed because Kroger's reliance on any misrepresentation by the Fund could not have been reasonable." Kroger, 226 F.3d at 915. "Kroger, the party asserting estoppel, obviously knew of its practice of designating the employees in question as casuals and,

therefore, it was in a better position that the Fund to know the truth that its practices did not comport with the CBA." Id. Thus, Kroger's estoppel argument fails.

## Conclusion

For the foregoing reasons, Central States is entitled to $88,627.50 that Kroger admits is owed to Central States on employees that Kroger now concedes were not casual employees. Central States is further entitled to delinquent contributions from Kroger for Little Rock and Houston. Central States is not entitled to delinquent contributions from Kroger for Memphis. Significant factual issues remain regarding Kroger's obligation for Louisville, the Michigan Dairy and Dallas, and those claims will be set for trial. The parties are to meet and confer on the amount of delinquent contributions for Little Rock and Houston consistent with this opinion. If they are unable to agree, the question of amounts owed (for Little Rock and Houston) will be heard along with the issue of liability for Louisville, the Michigan Dairy, and Dallas.

Enter:

David H. Coar
United States District Judge

Dated: August 11, 2003

-28-