**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS PENSION FUND, and HOWARD McDOUGALL, trustee, | ) ) ) ) | |
| and | ) ) | |
| CENTRAL STATES, SOUTHEAST AND SOUTHWEST AREAS HEALTH AND WELFARE FUND, and HOWARD McDOUGALL, trustee, | ) ) ) ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No.  01 C 2682 |
| THE KROGER, CO., an Ohio Corporation, | ) ) ) | HONORABLE DAVID H. COAR |
| Defendant. | ) | |

<u>**MEMORANDUM OPINION AND ORDER**</u>

On April 16, 2001, the Central States Southeast and Southwest Areas Pension Fund and the

Central States, Southeast and Southwest Areas Health and Welfare Fund (hereinafter referred to

as, "Central States", "The Fund," or "Plaintiffs") brought an action against the Kroger Co.

("Kroger" or "Defendant"), pursuant to §515 of ERISA, 29 U.S.C. §1154, to collect

contributions allegedly owed to Central States by Kroger.  The complaint seeks contributions for

workers from six of Kroger's distribution centers: (1) Houston; (2) Dallas; (3) Memphis; (4)

Little Rock; (5) Michigan Dairy; and (6) Louisville.  On August 11, 2003, this Court ruled on the

Parties' cross motions for summary judgment. The Court found that: (1) Central States was entitled to $88,627.50 that Kroger admitted was owed to Central States on employees that Kroger conceded were not casual employees; (2) Central States' motion for summary was granted for Little Rock and Houston from 1992 through 2001; and (3) Kroger's motion for summary judgment was granted against Central States for Memphis. However, because significant factual issues remained regarding Kroger's obligations for Louisville, the Michigan Dairy, Dallas and Houston from June 18, 1983 to December 31, 1991 and Little Rock from June 18, 1983 to December 31, 1991, those claims were set for trial. On February 23, 2004, a bench trial proceeded on these claims. At the close of trial, both Parties submitted post-trial memoranda, and proposed findings of fact and conclusions of law. Based on the trial, and Parties' pre-trial and post-trial submissions, the Court makes the following findings of fact and conclusions of law. To the extent that any findings may be deemed conclusions of law, they shall also be considered conclusions. To the extent that any conclusions may be deemed findings of fact, they shall also be considered findings. See Miller v. Fenton, 474 U.S. 104, 113-14 (1985).

**FINDINGS OF FACT**

***I.  The Parties***

1.      Plaintiff Central States, Southeast and Southwest Areas Pension Fund (the "Pension Fund") is an employee benefit plan and trust which is operated in accordance with a trust agreement.

2.      Plaintiff Central States, Southeast and Southwest Areas Health and Welfare Fund (the "Health and Welfare Fund") is an employee benefit plan and trust which is operated in accordance with a trust agreement.

3.      Plaintiff Howard McDougall is a trustee and "fiduciary" of Central States, as that term is defined in ERISA.

4.      The Pension Fund and the Health and Welfare Fund receive contributions from numerous employers pursuant to the terms and conditions of collective bargaining agreements between the employers and various local unions affiliated with the International Brotherhood of Teamsters. All contributions and income earned thereon are used for the exclusive purpose of providing benefits to participants (and eligible beneficiaries) pursuant to the provisions of the Pension Fund's Pension Plan and the Health and Welfare Fund's Health and Welfare Plan, and for paying Central States' necessary expenses.

5.       Defendant Kroger is a national retail grocery store chain, with its principal office located in Cincinnati, Ohio.

6.      Kroger is engaged in the business of operating grocery stores and related facilities and equipment nationwide, including facilities and equipment for the warehousing and transportation of goods for its stores.


## II.  The Kroger-IBT Collective Bargaining Agreements

7.      For more than thirty years, Kroger, in conjunction with various Local Unions of the International Brotherhood of Teamsters ("IBT"), has participated in the Fund.

8.    The eligibility requirements for participation in the Fund were set forth in multiple

collective bargaining agreements ("CBAs") that Kroger and the applicable IBT Local Unions

negotiated during the period December 1970 to December 2000.

9.    The CBA for each location consists of a Master Agreement and a Local Supplement.

10.    Each Master, negotiated periodically by Kroger and the IBT Kroger Negotiating

Committee, contains certain terms and conditions common to various bargaining units of

warehouse employees, drivers and other employees of Kroger.

11.    The Local Supplements are negotiated by Kroger and each Local Union for the bargaining

unit employees working in the specific location only.

12.    Local 968 of the IBT ("Local 968") and Kroger negotiated successive collective

bargaining agreements covering bargaining unit employees at Kroger's Houston, Texas

Marketing Area Distribution Center (the "Houston Center") covering at least the period from

December 27, 1970 through December 30, 2000.

13.    Local 745 of the IBT ("Local 745") and Kroger negotiated successive collective

bargaining agreements covering bargaining unit employees at Kroger's Dallas, Texas Marketing

Area Distribution Center (the "Dallas Center") covering at  least the period from December 27,

1970 to 1998.  The Dallas Center operations were sold to a third-party in August of 1998.

14.    Local 878 of the IBT ("Local 878") and Kroger negotiated successive collective

bargaining agreements covering bargaining unit employees at Kroger's Little Rock, Arkansas

Marketing Area Distribution Center (the "Little Rock Center"), covering at least the period from

December 27, 1970 to 1998.  The Little Rock Center was closed in early 1998.

15.     Local 337 of the IBT ("Local 337") and Kroger negotiated successive collective bargaining agreements covering bargaining unit employees at Kroger's Detroit, Michigan Dairy processing facility (the "Michigan Dairy"), covering at least the period from December 27, 1970 through December 30, 2000.

16.     Local 89 of the IBT ("Local 89") and Kroger negotiated successive collective bargaining agreements covering bargaining unit employees at Kroger's Louisville, Kentucky Marketing Area Distribution Center (the "Louisville Center"), covering at least the period from December 27, 1970 through December 30, 2000.

17.     The collective bargaining agreements that Kroger has entered into with Locals 968, 745, 878, 337 and 89 consist of two parts, a Master Agreement and a Local Supplement.  Each Master Agreement, negotiated periodically by Kroger and the IBT Kroger Negotiating Committee (made up of Local Union and IBT representatives appointed by the IBT Union), contains certain terms and conditions (e.g., pension) common to various bargaining units of warehouse employees, drivers and other employees of Kroger, including those working in Kroger's Houston, Dallas, Little Rock and Louisville Centers and the Michigan Dairy.  The Local Supplement is negotiated by Kroger and each Local Union for those bargaining unit employees working in their respective location only.  Each Local Supplement contains certain terms and conditions supplementing the Master Agreement.

18.     Since at least December 1970, Kroger has been bound by the Pension Fund Trust Agreement and the Health and Welfare Fund Trust Agreement

### III. Relevant Contract Language

19.      Each of the Master Agreements in effect from December 1970 to date define who is a "regular employee" and also distinguishes between "casual employees" and "probationary employees."

20.      Each of the Master Agreements in effect from the mid-1970's to date define the term "Casual Employee" as:

> Section 2.3 Casual Employees. (Those employees hired on a short-term basis) may be employed from time to time in those installations where such has been the practice. Before employing casual employees in other locations, the Employer will discuss the need with the Union, and such must be agreed to by the Union. Casual Employees shall not receive fringe benefits or accrue seniority and shall be limited to ten percent (10%) of the work force.

21.      Each of the Master Agreements in effect from at least 1980 to date define the term "Probationary Employee" as:

> Section 2.2 Probationary Employees. A new employee shall work under the provisions of the Agreement but shall be employed only on a trial period of thirty (30) working days, not to exceed (60) calendar days, during which period he may be discharged at the discretion of the Employer, provided however, that the Employer may not discharge or discipline for the purpose of evading this Agreement or discriminating against Union members. After thirty (30) working days or sixty (60) calendar days, whichever occurs first, the employee shall be placed on the regular seniority list.

22.      The Master Agreement authorizes Kroger's use of part-time employees.

23.      The Master Agreement in effect from at least the mid-1970s to date have contained the following provisions relating to pensions:

> Article 31      PENSIONS



Section 31.1 Each employee covered by this Agreement, who has been employed for thirty (30) days or more and is on the regular seniority list, except as provided in Section 31.3 will be covered by the Central States, Southeast and Southwest Areas Pension Fund. Each such employee shall be ineligible to participate in, or receive, any benefits under the Kroger Employees' Retirement Income Plan.

Section 31.2 The Employer shall contribute to the...Fund...[specified dollar amount that increased over the years] per week for each employee as set forth in Section 31.1 above, who has been employed for thirty (30) days or more and is on the regular seniority list...

Section 31.4 . . .Contributions to the Pension Fund must be made for each week on each regular or extra employee, even though such employee may work only part-time under the provisions of this contract, including weeks where work is performed for the Employer but not under the provisions of this contract and although contributions may be made for those weeks into some other Pension Fund. Employees who work either temporarily or in cases of emergency under the terms of this contract shall be not be covered by the provisions of this paragraph.

24.    From June 8, 1980 through September 8, 1990 and from June 1, 1997 through December

31, 2000, the Houston Center did not participate in the Health and Welfare Fund.

Effective September 9, 1990 until May 31, 1997, the health and welfare provision of the

Houston center agreement stated as follows:

All Bargaining Unit employees will be covered by the Central States, Southeast and Southwest Areas Health and Welfare Plan...the Employer shall contribute to the [Health and Welfare Fund]...[specified dollar amount that increased over the years] for each regular employee who has been on the payroll thirty (30) days or more and who has worked at least eighty (80) hours...Contributions to the Health and Welfare Fund must be made for each week on each regular or part-time [employees] under the provisions of this contract. Employees who work either temporarily or casually under the terms of this contract shall not be covered by the Central States C-4 plan.

### *IV.  The Kroger Locations and Time Periods at Issue*

25.      The trial involved employees at distribution centers operated by Kroger in Louisville, Kentucky, Houston, Texas, Dallas, Texas, and Little Rock, Arkansas and a dairy in Livonia, Michigan (the "Michigan Dairy").

26.     The liability period at issue for Louisville is June 18, 1983 through December 31, 2000.

27.     The liability period at issue for Houston is June 18, 1983 through December 31, 1991, but since there are no disputed employees at issue prior to 1987, the remaining liability period is 1987 through December 31, 1991.

28.     The liability period at issue for Dallas is June 18, 1983 through August 1998.

29.     The liability period at issue for Little Rock is June 18, 1983 through December 31, 1991.

30.     The liability period at issue for Michigan Dairy is June 18, 1983 through December 31, 2000.

### *V.  The Individual Distribution Centers and the Michigan Dairy*

#### *A.  The Houston Distribution Center (Count I)*

31.     As set forth above, the relevant time period for the Houston Center is 1987-1991 (since there are no casual employees contained in the Fund's audit for the years 1983-1986).

32.     All newly hired Houston Center warehouse employees were labeled as casuals from October 1987 through 1991.

33.     The individuals who were labeled by Kroger as casual employees in Houston from 1987 to 1991 were required to complete job applications when they were hired.

34. Also, individuals who were hired and labeled by Kroger as casuals in Houston from 1987 through 1991 were all interviewed by a Kroger management representative at the Houston Center.

35. During their job interviews, applicants were all told by Kroger management employees that they if they met certain productivity standards and came to work on time and as needed, they would become full time employees.

36. When hired, Houston Center casual employees were placed in the position of order selector.

37. Houston Center casuals received a brief orientation to the warehouse, and approximately one day of training from another Houston Center employee. Additional on-the-job training was provided as needed. Kroger also a had a mentor program that it used to provide continued training to casual employees.

38. Houston Center casual employees were required to meet certain productivity requirements (meaning pull a certain number of grocery cases in an hour). The productivity standards gradually increased until the casual met the full-time standard.

39. Casual employees had their productivity monitored almost every day by supervisors at the Houston Center. Each employee was required to improve his or her productivity on a weekly basis. Casual employees understood that if they did not meet their production requirement, they could be terminated.

40. Casual employees at the Houston Center did not have a written work schedule, but were told every Friday what days they would need to work for the subsequent week. Consequently, the days a casual could work could change from week to week.

41.  On weekends, the Houston Center was staffed entirely with casual employees, since regular employees did not work weekends.

42.  Houston Center casuals worked forty or more hours a week.

43.  Kroger's casual employees at the Houston Center were not seasonal employees, college students, or individuals supplementing another full-time job,

44.  Even when casual employees met the production standard necessary to become a full time employee, Kroger did not promote these individuals to full time until a full-time position opened up.

45.  Prior to becoming a full-time employee, a casual employee was required to serve a 30 day probationary period.   That thirty day probationary period was fulfilled by working the Houston Center's night shift.

46.  It was the Houston's Center hope and expectation when it hired casual employees, that these employees would stay with Kroger for a long period of time.


*B.  The Dallas Distribution Center (Count II)*

47.  From at least 1983 to 1998, the term "casual" at the Dallas Center was used interchangeably with "part-time."

48.  Virtually all of the warehouse employees hired by Kroger at the Dallas Distribution Center from 1983 though 2000 were labeled as part-time employees.

49.  Prior to being hired, Dallas Center part-time employees were required to complete job applications, take physicals, polygraphs and drug tests.

50.  When Dallas Center employees were hired, they were told that they would start part-time, and if they met production standards and were available to come to work whenever

called, they would become full-time. Conversely, if the part-time employee did not meet production standards, his or her hours would be reduced, and eventually, that individual would be terminated.

51. Typically, Dallas Center part-time employees would work 35-40 hours a week, four days a week. However, a part-time employee might work less hours, depending on the availability of hours for any given week.

52. Kroger made an effort to insure that the part-time employees at the Dallas Center did not average 32 hours of work (or more) over a 12 week period because they could then meet Kroger's definition of a regular employee and become eligible for health care benefits.

53. Part-time Dallas Center employees would usually work evenings.

54. Part-time employees were required to call in every day to see if they needed to show up for work that day.

55. There was no probation period prior to becoming full-time. If a full-time position opened up, and that position was not bid on by another full-time employee, it would be offered to a part-time employee.

56. Virtually all of the Dallas Center full-time employees were previous part-time employees.

57. There were some individuals who wanted to stay part-time because they had other full-time jobs, and work at the Kroger Dallas Center was considered supplemental work. In addition, there were some college students who worked at the Kroger Dallas Center.

58. However, for the overwhelming majority of part-time employees at the Dallas Center, it was Kroger's hope and expectation that these employees would stay with Kroger for a long period of time.

*C.  The Little Rock Distribution Center (Count III)*

59.     In its ruling on the Parties' summary judgment motions, this Court ruled that Central

States is entitled to the Little Rock contributions billed for the period after 1991.  Thus,

only the claims for the period prior to 1992 remain to be resolved.  The parties have

stipulated that the contributions owed to the Pension Fund for the period after 1991 total

$16,640.

60.      At least as far back as 1986, all of the warehouse new hires at the Little Rock Center

were classified as casual employees.

61.     Richard Bernath ("Bernath"), the Distribution Manager at the Little Rock Center from

1978 to 1998, claims that Kroger hired some new hires as probationary employees, but

Bernath acknowledged that the labeling of new hires as probationary was only before

September 1982, when they did not have the option to hire casual employees.  However,

Bernath acknowledges that beginning in September 1982, Kroger was allowed to (and

did) hire casual employees.

62.     Casual employees in Little Rock from 1983 through 1991 were required to compete job

applications when they were hired.

63.     The individuals who Kroger labeled as casual employees in Little Rock from 1983

through 1991 were interviewed by a Kroger employee.

64.     Bernath testified that Kroger hoped that every casual hired would stay with Kroger for a

long period time

65.     Before 1992, it was possible for individuals labeled as casual to work at Kroger's Little

Rock Center for two years without being offered a full-time position, if a full-time

position did not open up prior to that time.

66. Little Rock's former Warehouse Manager testified that it was advantageous for Kroger to hire everyone as casual employees because they were hired at a cheaper wage rate, and they did not receive any benefits.

67. Casual employees in the Little Rock Center received from one to two days of on the job training.

68. Kroger also provided performance feedback to its casual employees.

69. When new regular positions opened up at the Little Rock Center, Kroger preferred to fill those positions with its casual employees.

70. Casual employees who performed their jobs well, and stayed at Kroger's Little Rock Center, inevitably became full-time employees.

71. At the Little Rock Center, Kroger maintained a seniority list for casual employees, and when full-time positions opened, casuals were offered those positions based on the seniority list.

72. Employees labeled as casuals were continuously on hand at the Little Rock Center from June 1983 through 1991.

73. Thus, the evidence shows that at the time Kroger hired the employees labeled as casuals in Little Rock from 1983 through 1991, it was Kroger's hope and expectation that these employees would stay with Kroger for a long period of time.

74.    Since at least 1983, Kroger designated every new Louisville Center employee as a part-time employee.  (In Louisville, the term "part-time" had the same meaning as "casual.")

75.    The Louisville Center new hires were required to complete an employment application and were interviewed by Kroger.

76.    When they were hired, the part-time employees were never told their job was temporary or that they were only short-term employees who would be working from time to time. Instead, Kroger explained to the new hires that they were required to work every weekend, and that as long as they met a production standard of pulling 150 cases per hour and kept a good attendance record, they would be promoted to full time.

77.    During the interview process, applicants for the Louisville Center were told that they could make a career out of their employment with Kroger.

78.    During the week, all part-time employees fulfilled the position of order selector. However, during the weekends, part-time employees would fill other warehouse positions (including forklift operations), because full-time employees did not work weekends.  (In the early 1980's, the weekend work was Saturdays only; however, the weekend work soon expanded to include Sundays).

79.    If a full-time employee was absent, he was not replaced by a casual employee.  Rather, the employee was replaced by a full-time employee in the "utility pool."  Utility pool employees were full-time employees who knew how to perform every operation in the warehouse, so they could substitute for a full-time employee who was out for vacation, sick leave, injury, or for any other reason.

80.     Part-time and full-time employees were required to meet a specific production standard of 150 cases per hour.

81.     A part-time employee who did not meet the production standard would be coached, disciplined and ultimately, could be fired.

82.     Part-time employees received from two to four days training.  Often, that training would come from another part-time order selector who had worked for Kroger for several years.

83.     When a part-time employee first began working at the Louisville Center, he or she could work from twenty to twenty-four hours a week.  However, as that part-time employee's productivity increased, he or she would began to receive anywhere thirty to forty hours of work a week.  Some casuals worked more than 40 hours week.

84.     Part-time employees at the Louisville Center were told that they needed to join the local union within 30 days of commencing work for Kroger.

85.     From at least the early 1980s until approximately 1993, the part-time warehouse employees on the day shift did not have a work schedule for weekdays, but were to appear at the Louisville Center for a daily show up approximately 30 minutes before the shift began.  Beginning in approximately 1993, the daily show up was eliminated and the part-time employees were given a schedule.

86.     Prior to 1993, when the daily "show up" procedure was used, there were days when the volume of available work was so large that all of the day shift part-time employees who showed up were put to work.  Other times, the workload was insufficient for all the employees who showed up, and the supervisors picked which part-time employees would work on that particular day.  The supervisors selected employees based upon their production statistics for prior days.  There were only two reasons why a less productive

employee might be selected: a) a new hire who was making progress toward meeting the production standard might be picked to encourage the employee; (b) a more productive employee might be passed over as punishment for failing to show up as required on the weekend.

87.    The day shift part-time employees were required to make the daily show up and work on weekends. The were warned that they would not get work when the workload was light, regardless of their productivity, if they missed weekend work or regularly missed the daily show up.

88.    From the early 1980s until approximately 1993, the "show up" procedure did not apply to the Louisville Center part-time employees on the night shift. These employees were required to be available to phone each weekday between 3 p.m. to 5 p.m. If they were needed, they were told to come in to work. The night shift employees were told on Friday if they needed to come in on Sunday night. Beginning in 1993, the call in procedure for night shift employees was replaced by the same schedule system that applied for day shift employees.

89.    In addition to being available for the daily afternoon call, the Louisville Center night shift employees were also required to work on Sundays. If they did not show up on Sunday or were not available to take Kroger's daily call, they knew they would not be called in to work the next few days, even though work was available, as punishment.

90.    The Louisville Center maintained a "Casual List," which listed all of the casual employees at the location in seniority order. The list was used to determine who was the most senior casual, and therefore, eligible for any full-time opening.

91. Part-time employees were promoted to full-time in order of seniority (based upon their part-time hire date), when a full-time position opened through attrition, or Kroger's decision to expand the number of full-time employees.

92. The Local Supplement for the Louisville Center from 1970 to 1994 had the following provision:

> It is agreed that Article 2, Section 2.2 of the contract is superceded by the following: Until an employee in the warehouse and garage has worked four (4) consecutive weeks of five (5) days each he shall be on a trial basis and may be discharged at the discretion of the Employer.

93. Because of this provision, Kroger believed that if a part-time employee worked (4) consecutive weeks of five (5) days each, that individual would become eligible to become a regular, full-time employee. To prevent this from happening, Kroger would not allow casual employees to work (4) consecutive weeks of five (5) days each.

94. When a part-time employee was eligible to become full-time, a supervisor would approach that person and indicate that he or she needed to "start his/her time", which meant that the employee would start his or her probationary period of twenty days, by working four consecutive weeks of five days a week.

95. A part-time employee could turn down a full-time position that was offered to him or her. However, if the part-time employee did turn down that position, the part-time employee would go to the bottom of the casual seniority list.

96.     There were some employees who had other jobs and would work at the Louisville Center every weekend. For example, Ray Isaacs, who is in Central States' audit from early 1987 until 1988, also worked for a railroad company.

97.     There were also some employees who worked for the Louisville Center only during the summers.

98.     However, for the vast majority part-time employees, Kroger was their full-time job, and they could remain part-time for several years (in some cases, up to four years).

99.     For the vast majority of part-time employees at the Louisville Center, it was Kroger's hope and expectation that these employees would stay with Kroger for a long period of time

        *E.  The Michigan Dairy*

100.    The Michigan Dairy is a production plant for dairy products such as milk, cottage cheese, sour cream, etc. The products are distributed from the Michigan Dairy to the Kroger stores.

101.    James Brink was the human resources manager at the Michigan Dairy from 1984 to 1989 and was directly responsible for hiring employees.

102.    John Palmer has been the human resources manager at the Michigan Dairy from 1989 to the present. As the human resources manager, Mr. Palmer has been directly responsible for hiring employees at the Michigan Dairy.

103.    Sue Milligan ("Milligan") has been the human resources assistant at the Michigan Dairy from approximately 1989 to the present. Her responsibilities include handling employee benefits, wages, workers' compensation, orientation of new employees and interviewing

job applicants. Milligan is familiar with Kroger's practices in hiring employees at the Michigan Dairy.

104. At the Michigan Dairy, there are three employee classifications: (1) regular full-time employee; (ii) probationary full-time employee; and (iii) casual part-time employee.

105. At the Michigan Dairy, Kroger's determination as to whether it should hire someone as a casual employee versus a regular, full-time employee was not dependent upon whether it intended the individual to work short term or from time to time. Rather, it was dependant upon: (1) whether there was a full-time position available; (2) the state of the economy; and (3) whether the applicant had a relative who was working at Kroger in a regular, full-time position.

106. From some time prior to 1984 to the early 1990s, almost all of the new hires at the Michigan Dairy were hired by Kroger as casual employees.

107. When a casual employee was hired and informed about a full-time position, he or she was told that if a full-time position became available, he/she would be promoted to that position.

108. If a regular, full-time position opened up at the Michigan Dairy, Kroger's first choice was to fill that position with a qualified casual employee. Kroger would move a casual employee to fill that position based upon his/her work performance, work ethic, attitude, attendance, qualifications and reliability.

109. If a casual employee was a good employee and stayed long enough at the Michigan Dairy, he could become regular employee once a regular position opened up.

110. When Michigan Dairy advertised for a casual position, it did not mention that the position was short-term or temporary.

111. When a casual employee was hired, he received Michigan Dairy's rules and regulations.

112. During the work day, many casuals averaged more than 12 working hours per day, and would often average more than 40 hours a week during a work week.

113. Casual employees were required to join the union and had to pay union dues thirty days after the date of hire.

114. Typically, casual employees are hired to fill in for regular, full-time employees who are absent for various reasons. However, the Michigan Dairy has employees whose job classification is "vacation relief." These employees are used to fill in for regular, full-time employees who are on vacation, sick or injured. A vacation relief employee is not the same as a casual employee.

115. Casual employees are also typically used to temporarily supplement the regular work force. However, at the Michigan Dairy, casual employees are hired for certain positions only. Thus, those employees are not temporarily filling in for or supplementing the regular workforce.

116. Many of the employees designated as casual at the Michigan Dairy did not work on an "on-call" basis. Rather, they were given their work schedule four to five days in advance of the following work week.

117. A casual employee may have theoretically had the option of turning down work. However, employees rarely exercised this option, for fear of termination, being passed over for future work, or being passed over for regular, full-time positions. As a result,

some casual employees worked more hours than regular, full-time employees. If a casual employee was regularly unavailable for work, that employee was terminated or no longer offered work.

118. The turnover of Michigan Dairy's casual employees was high, but this was not because they were hired to work on a short-term basis or to work from time to time. Instead, the turnover resulted from the fact that some employees did not like the work, or could not meet Kroger's attendance and performance standards.

119. The Michigan Dairy believed that it could use casual employees whenever it wanted and however long it wanted. In addition, the Michigan Dairy believed that an employee could remain a casual indefinitely.

120. The Michigan Dairy occasionally hired college students to work during the Christmas and summers. These college students would work for the Michigan Dairy for approximately 12 to 16 weeks. However, the vast majority of the casual employees that were hired were not college students.

121. Consequently, with the overwhelming majority the Michigan Dairy employees, it was Kroger's hope and expectation that these employees would stay with Kroger for a long period of time.

**CONCLUSIONS OF LAW**

Consequently, as to all five locations, for the time periods at issue, the facts presented at trial show, for the overwhelming majority of casuals, it was Kroger's hope and expectation that these employees would stay with Kroger for a long period of time. Consequently, the employees at issue in this case at the Houston Center, Dallas Center, Little Rock, Louisville Center and Michigan Dairy were not casual employees, and contributions are due on their behalf. There are a number of issues the Court must address prior to determining Kroger's actual liability for each of the five locations. First, the Court must address what preclusive effect, if any, the Seventh Circuit's decision in  Central States, Southeast, Southwest Areas Pension Find v. Kroger Co., 226 F.3d 903 (7th Cir. 2000) (hereinafter referred to as "Kroger I") has on this case. Second, the Court must address whether any of Kroger's equitable defenses reduce its liability to Central States. Third, the Court must calculate the amount of Kroger's liability, and determine which calculation method is proper. Each issue will be addressed in turn.

*I.  To What Extent Are the Findings in Kroger I Binding on This Case?*

*A.  The Seventh Circuit's Decision in Kroger I*

Kroger's labeling of all newly hired warehouse employees as "casual employees" in its Atlanta, Georgia Marketing Area Distribution Center (the "Atlanta Center"), and its failure to remit contributions on behalf of those "casual employees" was the subject of prior litigation which was filed on June 18, 1993. Central States Pension Fund v. The Kroger Co., No. 93 C 3669 (N.D. Ill.). From 1977 until at least 1992, all or virtually all new warehouse employees at Kroger's Atlanta Center, when hired, were designated by Kroger as "casual" employees. (Kroger

I, 226 F.3d at 908).  The district court in <u>Kroger I</u> held that the term "casual employee" referred to those employees "that Kroger intended, when it hired them, to work for a short period of time. Casual employees, the Court reasoned, would not be employees Kroger expected 'in the normal course' to work 'for a long period of time.'" <u>Kroger I</u>, 226 F.3d at 912.  The district court also explained that "casual employees would be people 'who come and go, people whose employment is interrupted, people who might be absent for long periods of time,' rather than people 'who are on hand continuously to work part-time as needed.'"   <u>Id</u>.

The Seventh Circuit stated that it "[agreed] with the district court's assessment of the meaning of 'casual employee.'"   <u>Kroger I</u>, 226 F.3d at 912.   The district court in <u>Kroger I</u> observed that the Atlanta Center warehouse employees "could not have been hired 'on a short-term basis' because 'the employees in question were hired by Kroger with the hope and expectation that they would become, each of them, full-time regular employees when an opening occurred." <u>Id</u>. at 909.  Kroger's "hope was that the training that would be given to these employees would be utilized by the employees to complete their probationary period successfully and to equip themselves to become full-time employees when the opportunity arose." <u>Kroger I</u>, 226 F.3d at 909.  Moreover, the district court noted that "the employees in question could not have been 'employed from time to time,'. . .because that phrase referred to 'people who come and go, people whose employment is interrupted, people who might be absent for long periods of time,' and did not refer to people 'who are on hand continuously to work part-time as needed.'" <u>Kroger I</u>, 226 F.3d at 909.   In the district court's view, "the evidence showed that the employees in question were available, and were considered to be available by Kroger, 'on a continuous basis

to work part-time as needed during the peaks and valley's of Kroger's Atlanta operation.'" Id. at 909.

The district court further explained that "the content of the employee handbooks Kroger had provided to its new hires, as well as the manner in which the employees had been trained and nurtured, demonstrated that the employees in question, 'were by no means regarded as people who were likely to be on hand for only a short period of time.'" Kroger I, 226 F.3d at 909. As an example, the district court noted that one of the employee handbooks used by Kroger welcomed the employees to the "Kroger team" and instructed them to use the handbook "as a training tool and guide during your first several weeks at Kroger." Kroger I, 226 F.3d at 913.

The district court also explained, "it was expected that in the normal course, [these employees] would work for a long period of time, both as what was referred to as part-timers, and then eventually as people who achieved regular employment and got on the regular seniority list." Kroger I, 226 F.3d at 909. The district court also found that, "regardless of whether the employees stayed with Kroger for a long time, Kroger hired these employees with the intention that they would remain with the company and eventually become 'regular' employees." Id. at 913. Even though Kroger had a high turnover rate at the Atlanta facility, "there was also evidence that eventually a new hire that stayed with the company either had to bid for a permanent position, or failing that, was fired." Id.

Since the Atlanta Center employees were not casual employees when they were hired, the district court determined in Kroger I that they were necessarily probationary employees for whom contributions were owed after completion of the probationary period. Kroger I, 226 F.3d at 910. Because Kroger did not contribute on its new hires after they completed the probation period, but

instead, waited until the new hires bid on a warehouse job and completed a trial period, the court

determined in Kroger I that Kroger owed additional contributions to the Pension Fund.  Id.

During the course of Kroger I, Kroger represented that it maintained the same practice of

designating all new warehouse employees as "casual" warehouse employees and of not making

Pension Fund contributions on their behalf while in casual status at its Dallas, Houston,

Memphis, Little Rock and Louisville Centers.  The Seventh Circuit held:

> Whatever meaning Kroger and the Union may have ascribed to 'part-time' in the Local
> Supplement, Kroger's practice of treating the employees in question as 'casuals' for
> pension contributions purposes when, in fact, those employees were not hired on a short-
> term basis or employed from time to time cannot thwart the unambiguous definition of
> casual employees contained in the CBA."  Kroger I, 226 F.3d at 914.

### B.  What Aspects of Kroger I Are Binding on This Court?

_____The Fund contends that Kroger I is preclusive on three questions of law: (1) the notion

that each pairing of the Master Agreement with a Local Supplement results in a "single, unitary

contract"; (2) the determination that the term "casual" refers to the employees "who come and

go, people whose employment is interrupted, people who might be absent for longer periods of

time"; and (3) the conclusion that Kroger cannot treat employees as "casuals" for pension

contribution purposes if, in fact, they are not casuals within the meaning of the CBA.   Kroger

does not take issue with the first or third propositions.

Kroger, however, does dispute any suggestion that the interpretation of the CBA in

Kroger I, including the construction of the terms "casual" and "part-time," is binding in this case.

Kroger believes this is so because the claims in this case do not arise out of the CBA that was

construed in Kroger I, meaning, the single unitary contract formed by the integration of the

Master Agreement with the Atlanta Local Supplement.  Instead, Kroger contends, this lawsuit

involves five separate claims based on five distinct CBAs, each consisting of a pairing of the Master Agreement with a different Local Supplement.

Specifically, Kroger notes the language of the Louisville CBA, which covered the Louisville Distribution Center from June 18, 1993 through March 19, 1994. According to the Louisville CBA, Kroger was required to make pension contributions only for those personnel who had worked at least four consecutive weeks of five days a week, and who thereafter had been placed on the regular seniority list. Kroger contends that one of the reasons it limited the number of shifts per week that each casual could work was to ensure that casuals were not confused for probationary employees who satisfied the probationary period. Conversely, Central States argues that contributions should have made on behalf of these employees because the requirement of four consecutive weeks of five days per week in the Local Supplement is inconsistent with, and trumped by, the Master Agreement.


Issue Preclusion "refers to the simple principle that later courts should honor the first actual decision of a matter that has been actually litigated." <u>Chicago Truck Drivers, Helpers and Warehouse Union (Independent) Pension Fund v. Century Motor Freight, Inc.</u>, 125 F.3d 526, 530 (7th Cir. 1997 ) (internal citations and quotations omitted). Collateral estoppel ensures that "once an issue is actually and necessarily determined by a court of competent jurisdiction, that determination is conclusive in subsequent suits based on a different cause of action involving a party to the prior litigation." <u>Id</u>. (<u>citing</u> <u>Montana v .United States</u>, 440 U.S. 147, 153 (1979)). The prerequisites for collateral estoppel are satisfied when: (1) the issue sought to be precluded is the same as that involved in the prior action; (2) that issue was actually litigated; (3) the

determination of the issue was essential to the final judgment; and (4) the party against whom estoppel is involved was fully represented in the prior action. Chicago Truck Drivers, 125 F.3d at 530 (citing La Preferida, Inc. v. Cerveceria Modelo, S.A. de C.V., 914 F.2d 900, 906 (7th Cir. 1990)).

In the case of the relationship between the Master Agreement and Local Supplements at issue in the five locations before this Court, issue preclusion clearly applies. As previously noted, in Kroger I, the Seventh Circuit held that a Local Supplement's definition of a "casual employee", "cannot thwart the unambiguous definition of casual employees contained in the CBA." Kroger I, 226 F.3d at 914. In Kroger I, the parties actually litigated the meaning of "casual employee." That determination of the meaning of "casual employee" was essential to the outcome of the case. Further, as this Court noted in its August 11, 2003 Memorandum Opinion and Order, Kroger I precludes Kroger from arguing that the Master Agreement can be nullified by the Local Supplement. Central States, Southeast, Southwest Areas Pension Fund v. The Kroger Co., No. 01 C 2682, 2003 WL 21947018 at *14 (N. D. Ill.). This is because even though the Master Agreement and Local Supplement form a single, unitary contract, the Master Agreement controls over the local supplements. Id. Because the relationship between the Local Supplements and the Master Agreement was the same as that litigated in Kroger I; that issue was essential to judgment; and Kroger, upon whom estoppel is invoked, had a full and fair chance to litigate the issue in Kroger I, Kroger is precluded from attempting to relitigate the issue of the relationship between the Master Agreement and Local Supplements. Consequently, in all five locations at issue in this case, the Master Agreement and Local Supplements must be harmonized, and the Local Supplement cannot thwart the unambiguous definition of a "casual"

contained in the CBA. Therefore, in Louisville, it is of no consequence that employees labeled as "casual" did not complete four consecutive weeks of five days a week (particularly when Kroger *ensured* that these employees did not work four consecutive weeks of five days a week, so that they would not automatically become regular employees). What is important is whether Kroger intended, when they hired these employees, that they would stay with Kroger for a long period of time. And as the Findings of Fact state, for the overwhelming majority of casuals at the Louisville Center, it was Kroger's hope and expectation that these employees would stay with Kroger for a long period of time.[1]

## II.  *Do Kroger's Affirmative Defenses Limit Its Liability to Central States?*

Kroger argues that even if it is contractually obligated to pay contributions on  mislabeled employees, Central States should be barred from recovering anything under the equitable defense of laches. Laches bars those claims where a plaintiff's unreasonable delay in bringing suit harms the defendant. See Smith v. Caterpillar, Inc., 338 F.3d 730, 733 (7th Cir. 2003); accord National R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 121-22 (2002); Hot Wax, Inc. v. Turtle Wax, Inc., 191 F.3d 813, 824 (7th Cir. 1999). There are two elements to a claim of laches: (1)

---

[1] The Court does not take issue with Kroger's contention that Kroger I is not binding to any facts in this case. As Kroger correctly points out, the hopes and expectations of Kroger's managers in Dallas, Houston, Little Rock, Louisville and the Michigan Dairy were not at issue in Kroger I, nor were any other factual findings made concerning those locations in the prior litigation. Consequently, issue preclusion does not apply to any of the factual issues in dispute in this case.

unwarranted delay; and (2) prejudice. See Morgan, 536 U.S. at 122. Central States, against whom the defense is asserted, bears the burden of demonstrating that its delay was not unreasonable. See Zelazny v. Lyng, 853 F.2d 540, 541 (7th Cir. 1988). If the Plaintiff fails to carry that burden, the defense is established if the defendant shows it was prejudiced by the delay. Id. Kroger argues that there were several key pieces of evidence that the Fund ignored, thereby resulting in an unreasonable delay in bringing suit.

In 1993, Kroger and the Pension Fund entered into a Tolling Agreement which recited that the Pension Fund believed that "there may be [additional] contributions (and interest thereon) owed in addition to those sought in the 1983 Lawsuit [Kroger I] on behalf of . . .employees" who worked at other Kroger facilities and/or for Atlanta Center employees for periods prior to or subsequent to the audited period of December 26, 1986 to December 30, 1989. (Joint Stipulation of Facts ¶ 31; Ex. 85 to Joint Stipulation of Facts). The Tolling Agreement also recited that Kroger and the Pension Fund "believed it to be to their mutual advantage to avoid the expense and inconvenience of an expansion of Central States' audit to cover [other periods and locations]...until there has been a judicial resolution of the claims that have been asserted and the defenses that will be asserted in the 1993 Lawsuit." Id. Under the Tolling Agreement, the parties agreed that the statute of limitations would be tolled from the date Kroger I was filed (June 18, 1993), until 60 days after the decision in Kroger I became final. Id. In addition, it was agreed that the Pension Fund's claim for the other periods and locations would not be "barred by the doctrine of *res judicata* because they could have been raised in the 1993 Lawsuit." Id. Pursuant to the ten-year tolling agreement, for Kroger's equitable defenses, the

Court must examine whether Central's States failure to bring these claims prior to 1993 was unreasonable. Each specific claim will be addressed in turn.

### A. Kroger's Form 206 Reports

Kroger contends that its use of casuals in each of the locations at issue has been in full view from the outset, and its use of casuals was disclosed to the Fund each month in Form 206 Reports, dating from the mid-1970's to the present. Kroger notes that each Form 206 alerts the Fund to any changes in an employee's eligibility for pension contributions, including changes to and from part-time or casual status. Kroger argues that the evidence shows that in the 1970's and 1980's, Kroger disclosed to the Fund that it was no longer making contributions for certain employees because it had reclassified them as part-timers. Kroger notes that the Fund reviewed these submissions to see if Kroger's reclassification of employees was consistent with the CBAs, and to confirm that all required contributions had been made. Kroger asserts that although the Fund's position is that contributions must be made for part-time employees, and although Kroger was reporting as early as the mid-1970's that it was not making contributions for employees who had been reclassified as part-timers, the Fund waited nearly twenty years, until 1993, to pursue this litigation. Defendant believes that this delay was unreasonable.

Kroger has not provided any evidence that would indicate that these Form 206 Reports sufficiently alerted Central States to the fact that Kroger was improperly labeling employees. As Central State correctly notes, the reporting forms relied upon by Kroger erroneously indicated that contributions were not owed on part-time employees. Kroger, not Central States, was in the better position to know if contributions were due, and had no way of knowing that Kroger was

mislabeling employees from these forms. Consequently, the Form 206 Reports do not justify limiting Kroger's liability.

### B. Did the CBA's Put the Fund on Notice?

Kroger believes that from at least the early 1970s, the CBAs put the Fund on notice that Kroger might be using casuals in a manner inconsistent with the Fund's practices. Kroger asserts that the CBAs in effect since the 1970s have contained certain specific and detailed provisions regarding the use of casuals, a feature that the Fund considers to be a "signpost", making it more likely that the employment of casuals is a problem. Yet, Kroger contends, the Fund ignored that signpost when reviewing Kroger's CBAs.

Specifically, Kroger argues, the Fund disregarded the plain language of Article 2, Section 2.3 of the Master Agreement (versions of which have been in effect since the 1970s), which provides that casuals are ineligible for contributions, and arguably contravenes the Fund's policy prohibiting "adverse selection among classes of employees with respect to pension and welfare benefits." Kroger contends that although Section 2.3 defines casuals as "employees hired on a short term basis," it sets forth no specific limit on the length of time they may work for Kroger in a casual capacity.

In addition, Kroger contends the Fund ignored a number a signposts in the Local Supplement portions of the CBAs. For example, Kroger notes that the Little Rock CBAs in effect from 1982 to 1985 contained provisions for working casuals with "regularity" and scheduling them based on their "length of service." Kroger believes that both of these provisions suggest an employment relationship of some permanence. Kroger also points to language in the Louisville Local Supplement in effect during the relevant time period that addressed the

promotion of casuals to regular full-time employment, and minimum scheduling requirements for casuals. Further, Kroger contends that none of the Local Supplements in effect during the relevant period limited the length of time that a casual could work for Kroger, which Kroger feels is an omission that could result in rejection of a CBA in its entirety under the Fund's rules.

Kroger's argument is foreclosed for the same reasons that the Form 206 Reports did not give rise to a valid laches defense. Kroger, as the employer, was in the better position to know whether its practices complied the CBAs provisions for the use of "casuals." Kroger argues that certain provisions of the Master Agreement and Local Supplements authorize the use of casuals in the manner that Kroger did at the locations at issue. However , none of these provisions authorize Kroger's use of casuals, a use of casuals that was identical to the use of its regular employees, except that Kroger did not pay benefits for the casual employees. Central States was not in a position to know that Kroger's use of casual employees thwarted the meaning of casuals as proscribed by the CBAs. "Here Kroger, the party asserting [the equitable defense], obviously knew of its practice of designating employees as casuals and, therefore, it was in a better position than the Fund to know the that its practices did not comport with the CBA." Kroger I, 226 F.3d at 914-15. Consequently, the CBAs cannot be said to have sufficiently alerted Central States to Kroger's practice of improperly labeling casuals.

### C.  Did the Indianapolis Audit Put the Fund on Notice?

Kroger contends that the Fund's audit in 1980 of Kroger's Indianapolis Distribution Center would have spurred a reasonable fund to investigate and prosecute its claims. During the Indianapolis audit, which covered a three-year span, the Fund learned that Kroger was employing casuals for more than a year, and that their employment was neither temporary nor unreasonable.

Based on this finding, the Fund's auditors recommended that the audit period be extended beyond the normal three year scope, due to the extent of under reporting. The Fund also assessed Kroger over $144,000 in contributions owed, although it later reversed the assessment. Kroger believes that because the Master agreement that covered the Indianapolis facility also applied to the Dallas, Houston, Little Rock and Louisville facilities, as well as to the Michigan Dairy, the Fund should have probed the use of casuals in those locations as well.

Although Kroger is correct that the same Master Agreement is in effect for the five locations at issue in the case before this Court and the Indianapolis facility, it does not follow that the Fund was obligated to conduct an investigation into the hiring of casuals at those five locations, and that the failure to conduct an investigation is "unreasonable." The fact that one location mislabeled casual employees does not automatically lead to the conclusion that all locations are mislabeling casuals. "The fact that one facility, located in a different state and operating under a different agreement with a different local, may have treated some employees improperly, cannot reasonably be said to require the Fund to suspect, investigate and audit all of its other localities." Central States, Southeast, and Southwest Areas Pension Fund v. The Kroger Co., No. 01 C 2680, 2004 WL 2452737 at *10 (N.D. Ill. 2004). As such, the circumstances of the Indianapolis audit will not limit Kroger's liability to Central States for the five locations at issue in this case.

### D. Did the 1988 Investigation in Dallas Put the Fund on Notice?

In 1988, the Fund launched an investigation of the Dallas Distribution Center. In April 1988, Luanne Lukasweski ("Lukasweski"), an Account Analyst at the Fund, sent the local union a list of Dallas employees covered by the CBA for whom Kroger did not begin making pension

contributions within 30 days of the date of hire, as required by the CBA. Lukasweski, who was responsible for ensuring that employers remitted the contributions due under the applicable CBAs, was concerned that Kroger had not made any contributions for employees who had been on the payroll for more than 30 days and, therefore, appeared to be eligible under the Dallas CBA.

A week after she wrote to the union, Lukasweski forwarded a copy of her letter to James Snyed ("Snyed), Manager of Human Resources at Kroger's Dallas facility, and asked him to respond on behalf of Kroger. On June 15, 1988, Lukasweski spoke with Snyed on the telephone, memorializing the following details of the conversation:

> Re: According to Mr. Snyed
>
> All people that are hired for the warehouse are hired as casual help (part-time). They can work month [sic] even years until they become regular fulltime workers and are on the seniority
> One of 2 things must occur
>
> 1. They are ready to work full time (many are students)
>
> 2. There is an opening for a regular full time job.

See Def.'s Trial Ex. 7(c).

Kroger contends that Lukasweski's note shows that the Fund was reviewing Kroger's Form 206 submissions, and was aware from those reports that Kroger was not making pension contributions for some significant portion of its workforce, despite the fact that those employees had been on the payroll for more than thirty days. In addition, Kroger believes that the note demonstrates that Kroger's use of casuals was open and notorious, and that Kroger made no effort to conceal any of its employment practices from the Fund. Third, Kroger argues that the note confirms that at the very latest, the Fund understood by June 1988 that Kroger was: (1)

classifying all new hires as casuals in Dallas; (2) not making pension contributions on their behalf; and (3) employing them in some cases for months and years before promoting them to full-time employment.  Thus, Kroger contends, the Fund's decision to wait another five years before pressing its claim was unreasonable.

The five year delay between the 1988 Dallas investigation, and the time the Fund brought its claims, is not unreasonable, particularly when the statute of limitations gives a party ten years in which to bring claim.  It is inherent that employment practices must be observed over time, in order for Central States to properly assess the extent of contributions due.   Consequently, it is reasonable that an investigation of Kroger's practices may take a number of years, particularly when a number of employees are involved. Because of the complexity and number of potential claims, it was not unreasonable for Central States to wait five years prior to commencing suit against Central States for claims in the Dallas Center.

### *E.  Was Kroger Prejudiced by The Fund's Delay?*[2]

Kroger contends that it is prejudiced by the fact that many of the people who participated in the events giving rise to this dispute (which spans more than twenty years) have forgotten what transpired.  As an example, Kroger notes that Thomas Saenz, who testified on behalf of Central States, could not recall whether the Houston Distribution Center employed college students as

---

[2] Although a laches claim fails if the first element, unreasonable delay, is not established, the Court will still address Kroger's arguments that it was prejudiced by Central States' delay.

casuals.  In addition, Kroger contends that it was prejudiced because other witnesses who could have shed light on one or more of the disputed issues in the case are deceased or out of touch with the Defendant.   Kroger notes John Shearrow, the former Distribution Manager for the Louisville Distribution Center, who could have testified about the hiring and deployment of casuals in Louisville during the period December 1973 through March 1994, was deceased by the time this lawsuit was filed.   Further, Kroger contends that it has been prejudiced by the destruction of documents that bear directly on the disputed issues in this case.  In particular, Kroger notes that pursuant to its ten-year record retention policy, the Fund destroyed many of its records containing the 1980 audit of the Indianapolis Distribution Center.

The Court finds that Kroger was not prejudiced by the lack of evidence, due to the Fund's delay.  There was more than ample evidence submitted by the Court to both Parties, and that evidence was not compromised to the detriment of Kroger due to the passage of time.   All material facts and evidence were before the Court during the Parties' proceedings, and that evidence showed, by a preponderance of the evidence, that the employees in question were not casuals, but were full-time regular employees for whom contributions were due.   Consequently, Kroger was not prejudiced by the passage of time.

Finally, Kroger asserts that its potential liability has grown exponentially, due to Fund's delay, thereby increasing Kroger's liability for past due contributions, interest and penalties, as well as the added cost of an audit that spanned almost 30 years.  Kroger maintains that if the Fund had filed suit in a timely manner in or about 1980, Kroger would have negotiated a different agreement with the union and obtained the Fund's approval, or it would have changed

its practices so that no casual worked more than what the Fund deemed to be consistent with the CBAs.

Again, even though there has been no unreasonable delay, thereby making the issue of prejudice irrelevant, Kroger has not demonstrated any prejudice relating to damages. It is simply being asked to pay the contributions due to employees who are actually full-time regular employees. Further, as Central States notes, the payment of interest is not prejudicial because Kroger has had the time value of the money that belongs to Central States. In addition, liability for liquidated damages, attorneys' fees and costs, and audit fees and costs, are costs arising from the litigation from the Parties and are not prejudicial.

Kroger has not shown that the two elements of laches, unwarranted delay and prejudice, are applicable to the facts of this case. Consequently, Kroger's liability to Central States will not be limited by equitable defenses.

### III.  Calculation of Damages

Kroger believes that if any liability is assessed against it, that liability should be determined pursuant to the 1000 hour rule. In 1997, the Fund informed Kroger that in order to ensure that its CBAs conform with Fund policy, it should negotiate an arrangement with the IBT whereby Kroger agreed to begin making contributions on behalf of casual employees once they have worked 1,000 hours or more in a twelve-month period. In response to the Fund's directive, Kroger and the IBT entered into a Letter of Understanding in which Kroger agreed to make pension contributions on casual employees after they worked 1,000 hours in any year. Consequently, Kroger contends, the 1,000-hour rule is a bright line test that provides a

convenient way to determine whether Kroger intended for a casual employee to work for a long period of time.

Central States contends that the 1,000 hour agreement is inapplicable here because it applies solely to casual employees who are still defined in the CBA as "short term employees [who] work from time to time." Central States notes that none of the employees in this case satisfy the definition of the 1,000 hour rule, because they are full-time regular employees. Alternatively, Central states argues, even if the 1,000 hour rule did apply, the agreement was prospective only. Central States contends that at the time the 1,000 rule agreement was accepted by the Fund, there had been no appellate ruling in Kroger I, so there was still some doubt about Kroger's liability to the Fund. Further, the Fund states that at no time did it agree to retroactive application. Central States asserts that the Court recognized that the 1,000 hour threshold was just a test to determine whether a specific employee was a casual. Central States believes that its twelve week cutoff is sufficient for determining whether an individual is a "casual."[3]

After an examination of the evidence, the Court determines that Central States' damages calculations sufficiently exclude individuals who Kroger did not intend, at the time they were hired, to be full-time employees. As Central States correctly notes, the 1,000 hour rule is in no way binding in this case, as the agreement was a prospective, not retrospective one. The twelve

---

[3] The 12 week cutoff derived from a memo issued by Kroger's Director of Labor Relations on March 17, 1981. In relevant part, stated:

> An employee shall be classified as a regular employee at the end of the first 12 consecutive workweeks during which his average hours worked equal or exceed 80% of the hours in the basic workweek for his classification.

See Pl Tr. Ex. 21.
In approaching the audit of Kroger's Houston, Dallas, Little Rock, and Louisville Centers and the Michigan Dairy, Central States' auditors eliminated all employees who worked less than 12 weeks, except in some instances where the employee was eventually reported to Central States.

week standard is a sufficient threshold to exclude individuals that were actually college students who worked during the summer, or merely at Kroger for weekend work, or to supplement additional employment. Consequently, damages will be calculated pursuant to the twelve week cutoff.

In an ERISA delinquent contribution suit brought under 29 U.S.C. § 1145, the plan is entitled to the following relief under 29 U.S.C. § 1132(g)(2): (i) the unpaid contributions; (ii) interest on the unpaid contributions; (iii) an amount equal to the greater of the interest or liquidated damages as provided under the Plan in an amount not in excess of 20 percent of the unpaid contributions; and (iv) reasonable attorneys' fees and costs; and such other relief as the Court deems appropriate.

Central States incurred $169,490.86 in fees and costs in connection with the audit of Kroger's Houston, Dallas, Little Rock, Memphis and Louisville Center and Michigan Dairy. In its summary judgment motion, Central States sought an award of $4,393,243.70 in contributions from Kroger. However, the Court ruled against Central States with respect to the Memphis Center and the claims for the period prior to June 18, 1983. Kroger has already paid $88,627.50 of the audit claim. The remaining amount Central States claims is owed is $3,250,901.81. Audit fees and costs should be prorated based upon the amounts awarded to Central States. Since the amount awarded is 75% of the original demand of $169,490.86, audit fees and costs are $127,118.15.

Under the Pension Fund and Health and Welfare Trust Agreements, interest is computed and charged at an annualized rate equal to the two percent (2%) plus the prime rate interest established by the Chase Manhattan Bank (New York, New York) for the fifteenth (15th) day of

the month for which interest is charged (See Exs. 64-55 to Joint Stipulation of Fact 1, Art. XIV, §

4.). Additionally, under the Pension Fund and the Health and Welfare Fund's Trust Agreements,

Central States is entitled to post-judgment interest computed at an annualized interest rate equal

to two percent (2%) plus the prime rate interest rate established by Chase Manhattan Bank (New

York, New York) for the fifteenth (15th) day of the month for which interest is charged. Id.

Finally, in its August 11, 2003 Memorandum Opinion and Order, this Court entered

summary judgment in favor of Central States for the $88,627.50 in contributions that Kroger

conceded were owed on non-casual employees. Kroger has stipulated that the contributions

owed on these individuals totals $88,627.50, and it has paid this amount. However, Kroger has

failed to pay accrued interest and additional interest on this amount. Accordingly, Central States

is entitled to interest and additional interest under 29 U.S.C. § 1132(g)(2)(C).

### IV. Conclusion

For the foregoing reasons, judgment is entered in Central States' favor, and Kroger is ordered to

pay $3,250,901.81 in contributions (which excludes the $88,627.50 that Kroger has paid). In

addition, pursuant to §502(g)(2) of ERISA and the trust agreements, Kroger shall pay (a) doubled

interest on the $3,250,901.81 through the date of judgment ; (b) doubled interest on the

$88,627.50 in contributions that Kroger paid after those contributions were awarded by the

Court; (c) attorney's fees and costs; and (d) audit fees and costs of $127,118.15. Further, the

post-judgment interest shall accrue at the prime rate plus 2%.


Enter:

/s/ David H. Coar

_____

David H. Coar
United States District Judge

**Dated: March 30, 2005**